## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

WHITE EARTH NATION, HONOR
THE EARTH, INDIGENOUS
ENVIRONMENTAL NETWORK,
MINNESOTA CONSERVATION
FEDERATION, MN350, CENTER
FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB, and NATIONAL
WILDLIFE FEDERATION,

      Plaintiffs,

          vs.

JOHN KERRY, in his official
capacity as Secretary of State, and the
UNITED STATES DEPARTMENT
OF STATE,

      Defendants.

Case No. 14-cv-4726
(MJD/LIB)


FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## INTRODUCTION

1.     Plaintiffs bring this case to challenge a U.S. Department of State ("State Department") decision to approve construction and operation of a new border-crossing crude oil pipeline and a significant increase in the capacity of an existing cross-border crude oil pipeline without first complying with the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and State Department regulations.

2.     Enbridge Energy, Limited Partnership ("Enbridge") owns and operates the pipelines at issue in this case. The pipelines cross the U.S.-Canada border and are therefore subject to the State Department's authority over the construction and operation of pipeline facilities that cross an international border.

3.     Enbridge is proposing to construct and operate a new 36-inch diameter pipeline to import heavy tar sands crude oil from Alberta, Canada to its terminal facilities in Superior, Wisconsin (the "New Pipeline"). However, Enbridge has already constructed a 17.5-mile segment of the New Pipeline that crosses the U.S.-Canada border with 34-inch diameter pipe (the "New Border Segment"), claiming it is an existing pipeline known as Line 3 and subject to a permit that it claims allows unlimited crude oil imports.

4.     Enbridge also owns and operates the Line 67 pipeline, which was known during its development phase as the "Alberta Clipper." Enbridge is currently seeking authority from the State Department to increase the amount of heavy tar sands oil it imports on Line 67 from 450,000 barrels per day ("bpd") to 800,000 bpd (the "Line 67 Expansion Project").[1] Pursuant to NEPA, the State Department is in the process of involving the public and evaluating the environmental impacts from importing this additional oil on Line 67. The State Department has also initiated consultation procedures required by Section 106 of NHPA.

---

[1] Unless otherwise stated, capacities represent annual average volumes. Enbridge calculates annual average capacities as 90 percent of design capacity. Therefore, an annual average capacity of 800,000 bpd for heavy tar sands crude oil is equal to a full design capacity of 880,000 bpd.

5.      However, Enbridge refuses to wait for completion of the NEPA and NHPA processes, and instead plans to divert up to 800,000 bpd of crude oil from Line 67 onto the New Border Segment north of the border and then re-route it back onto Line 67 south of the border to circumvent the ongoing reviews of the Line 67 Expansion Project (the "Bypass Project").[2]

6.      On July 24, 2014, the State Department authorized Enbridge to proceed with the Bypass Project. This authorization allows Enbridge to (1) increase the capacity of Line 67 to 800,000 bpd, and (2) construct and operate the New Pipeline. The State Department's action violates NEPA's fundamental requirement to "look before you leap." The State Department further violated NHPA by failing to consult with necessary parties on the projects' impacts on cultural and historic resources before authorizing the projects.

7.      As a direct result of its failure to comply with NEPA, NHPA, and State Department regulations, the State Department's actions directly harm Plaintiffs' interests in the environment and cultural and historic resources. The State Department's actions further harm Plaintiffs' interests in these resources by increasing the risk of real harm through uninformed decisionmaking.

8.      Plaintiffs request that this Court: (a) enter a declaratory judgment that the State Department approved the New Pipeline, the Line 67 Expansion Project, and the Bypass Project in violation of NEPA, NHPA, State Department regulations, and the Administrative Procedure Act ("APA"); and (b) issue injunctive relief enjoining each

---

[2] *See* Exhibit A, Plaintiffs' diagram of the New Pipeline and the Bypass Project.

project unless and until the State Department complies fully with NEPA, NHPA, and State Department regulations.

9.      Plaintiffs Center for Biological Diversity and Sierra Club also bring this case to challenge the State Department's failure to comply with related requests for information under the Freedom of Information Act ("FOIA").

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action by virtue of the APA, 5 U.S.C. § 551 *et seq*., FOIA, 5 U.S.C. § 552, and 28 U.S.C. § 1331 (federal question jurisdiction).

11.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 701-706, and 5 U.S.C. § 552.

12.      Venue is proper in this judicial district and in this Court pursuant to 28 U.S.C. § 1391(e)(1)(b) because a substantial part of the events or omissions giving rise to the claim occurred here, and pursuant to 5 U.S.C. § 552(a)(4)(B).

## THE PARTIES

13.      Plaintiff WHITE EARTH NATION is a federally recognized Indian tribe, which occupies a Reservation in Northwest Minnesota. The White Earth Reservation was established by the 1867 Treaty between the United States and the Chippewa Indians of the Mississippi. 16 Stat. 719 (1867). The governing body of White Earth Nation is a

successor in interest tribal government to the signatories of the 1855 Treaty of

Washington between the United States and the Mississippi, Pillager, and Winnibigoshish

Bands of Chippewa Indians. 10 Stat. 1165 (1855). White Earth Nation tribal members

enjoy hunting, fishing, gathering, and other rights in the territory ceded to the United

States by the 1855 Treaty ("Treaty Territory"). White Earth Nation attaches religious and

cultural significance to this territory and is a "consulting party" under the State

Department's NHPA process for the pipelines at issue. White Earth Nation's address is

PO Box 418, White Earth, MN 56591.

  14. The 1855 Treaty Territory is a "tangible property" within the meaning of

NHPA because it is a "site"—a "location of . . . a prehistoric or historic occupation or

activity . . . [which] possess[es] historic [or] cultural . . . value." The Treaty Territory is

an integral part of the Tribe's culture, and is necessary for the culture to continue. It is

associated with events that have made a significant contribution to the broad patterns of

American history, and may yield important information regarding prehistory or history.

The Treaty Territory also contains traditional cultural properties including wild rice beds

and water resources.

  15. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a

national, nonprofit conservation organization with more than 50,000 members dedicated

to the protection of endangered species, biodiversity, and ecosystems throughout the

world. The Center works through science, law, and creative media to protect the lands,

waters, and climate that species need to survive. The Center has an office in Duluth,

Minnesota, and hundreds of members in Minnesota and Wisconsin. The Center's Duluth office is located at 209 East 7th Street, Duluth, MN 55805.

16.     Plaintiff SIERRA CLUB is a national nonprofit organization of over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which the New Pipeline will pass, through which Line 67 also passes, and in the states where the refining of the tar sands crude would take place. The Sierra Club's concerns encompass the protection of wildlands, wildlife habitat, water resources, air, climate change, public health, and the health of its members, all of which stand to be affected by the New Pipeline and increased tar sands imports on Line 67. The Sierra Club's headquarters are located at 85 2nd Street, 4th Floor, San Francisco, CA 94109.

17.     Plaintiff HONOR THE EARTH is a national Native American environmental organization which since l992 has worked on issues of fossil fuels, extreme extraction, and sustainability. The organization is headquartered on the White Earth reservation in northern Minnesota, and has leadership comprised of tribal members from the Anishinaabeg of northern Minnesota. The organization is committed to a sustainable economy predicated on ecological and cultural vitality. Many of Honor the Earth's members continue the way of life of their ancestors by hunting, fishing, and

gathering in the 1855 Treaty Territory. Honor the Earth's address is PO Box 63, Callaway, MN 56521.

18.     Plaintiff INDIGENOUS ENVIRONMENTAL NETWORK ("IEN") is a nonprofit organization that works with indigenous individuals and grassroots community groups to protect their sacred sites, land, water, air, natural resources, and the health of their people and all living things, and to build economically sustainable communities. IEN's work encompasses a range of environmental and economic justice issues that impact the lands and cultures of indigenous peoples and individuals, including mining and oil development on and near indigenous lands, soil and water contamination from energy exploration and development, climate change, water conservation, and the transboundary movement of hazardous materials along the U.S. borders with Canada and Mexico. IEN's headquarters are located at 219 Bemidji Avenue, Bemidji, MN 56601.

19.     Plaintiff MINNESOTA CONSERVATION FEDERATION ("MCF") is a Minnesota-based common-sense conservation organization made up of hunters, anglers, and others who are dedicated to the enjoyment, education, and ethical use of our natural resources. MCF is committed to saving and faithfully defending from waste the natural resources of our country, its air, soil and minerals, its forests, waters, and wildlife. MCF is the Minnesota affiliate of National Wildlife Federation. MCF is committed to protecting wildlife and habitat from the impacts of major development projects, including impacts like oil spills. MCF has an office at 542 Snelling Avenue, #104, Saint Paul, MN 55116.

20.     Plaintiff MN350 is a Minnesota nonprofit organization with approximately 2,500 members and supporters dedicated to returning our common climate to the safe, sane level of 350 ppm of $CO_2$ or lower, curbing expanded use of fossil fuels, and the adoption of clean energy. Further, MN350 is also focused on changing the demand for energy, while also creating alternative ways to live in a sustainable, just, and fulfilling world. MN350 has members and supporters throughout Minnesota, including in counties that could be impacted by the New Pipeline, Line 67 Expansion, and Bypass Project. MN350's concerns encompass reducing impacts to our climate, and protection of water resources, clean air, public health, and the health of its members, all of which stand to be affected by the pipeline. MN350's office is located at 2104 Stevens Avenue South, Minneapolis, MN 55404.

21.     Plaintiff NATIONAL WILDLIFE FEDERATION ("NWF") is the nation's largest nonprofit conservation advocacy and education organization. NWF has over one million individual members, including approximately 18,700 and 22,500 members in Minnesota and Wisconsin, respectively, and affiliate organizations in 49 states and territories, including North Dakota, Minnesota, and Wisconsin. NWF's mission is to inspire Americans to protect wildlife for our children's future. NWF also works to protect wildlife, wild places, and natural resources from the impacts of fossil fuel development projects including oil spills and climate change. NWF's headquarters are located at 11100 Wildlife Center Drive, Reston, VA 20190.

22.     Plaintiffs bring this case on their own behalf and on behalf of their members who live, work, recreate in, and otherwise use and enjoy areas that will be

affected by air and/or water pollution from the Line 67 Expansion Project, the Bypass Project, the New Pipeline, related facilities, refineries processing oil transported by the Line 67 Expansion Project and the New Pipeline, and by the deleterious impacts of increased emissions of greenhouse gases resulting from the refining and end-use of tar sands crude oil.

23.     Plaintiffs' members face increased risk of harm to their health, recreational, economic, spiritual, and aesthetic interests as a result of the State Department's decision to allow projects with significant environmental impacts to proceed without fully analyzing and considering those impacts. The State Department's failure to provide required information and to analyze and/or mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the Line 67 Expansion Project, Bypass Project New Pipeline has also deprived Plaintiffs' members of their right to participate fully in the State Department's decisionmaking process.

24.     Plaintiffs' members live and recreate in Superior, Wisconsin, near Enbridge's terminal facility. Plaintiffs' and Plaintiffs' members' interests in air quality will be harmed by increased emissions of volatile organic compounds ("VOCs") and hazardous air pollutants from the Superior terminal caused by the increase in crude oil throughput and storage from the Bypass Project, Line 67 Expansion, and the New Pipeline.

25.     Plaintiffs' members use and enjoy areas along the Line 67 and Line 3 rights-of-way that may be adversely affected by the Bypass Project, Line 67 Expansion, and the New Pipeline for fishing, hunting, camping, photography, and for engaging in

other environmental, vocational, scientific, educational, religious, cultural, aesthetic, and recreational activities. Plaintiffs' members will continue to use and enjoy these areas frequently and on an ongoing basis in the future, including this winter and in the spring and summer of 2015.

26.     The New Pipeline will run and Line 67 currently runs directly through the 1855 Treaty Territory. Plaintiffs White Earth Nation, Honor the Earth, and Indigenous Environmental Network have numerous members who have long lived and worked within the 1855 Treaty Territory, including in close proximity to the routes for the New Pipeline and Line 67. These members engage in numerous activities within the 1855 Treaty Territory, including hunting, fishing, and gathering; and engaging in spiritual and cultural practices. Native plants, animals, and sites within the 1855 Treaty Territory traditionally have been and continue to be important to members of White Earth Nation, Honor the Earth, and Indigenous Environmental Network for subsistence, spiritual, medicinal, and other purposes.

27.     Plaintiffs' and Plaintiffs' members' injuries would be redressed by the relief sought if the Court enjoins the Line 67 Expansion, Bypass Project, and New Pipeline unless and until the State Department complies fully with NEPA and NHPA.

28.     Defendant JOHN KERRY is the Secretary of State and is sued in his official capacity. Pursuant to Executive Order 13,337, 69 Fed. Reg. 25,299 (April 30, 2004), Secretary Kerry is responsible for determining whether to issue permits for the construction, connection, operation, or maintenance at the borders of the United States of facilities for the exportation or importation of petroleum products or other fuels to or

from a foreign country. In carrying out these duties, Secretary Kerry must ensure

compliance with the requirements of NEPA and NHPA.

29.     Defendant UNITED STATES DEPARTMENT OF STATE is a federal

agency whose chief administrator is the Secretary of State. The State Department

processes applications for Presidential permits for the construction, operation, and

maintenance of facilities on the U.S.-Canada border. In carrying out its responsibilities,

the State Department must comply with applicable requirements of NEPA, NHPA, the

APA, and FOIA.


## LEGAL BACKGROUND

### National Environmental Policy Act

30.     The National Environmental Policy Act is our "basic national charter for

the protection of the environment." 40 C.F.R. § 1500.1. Congress enacted NEPA "[t]o

declare a national policy which will encourage productive and enjoyable harmony

between man and his environment; to promote efforts which will prevent or eliminate

damage to the environment and biosphere and stimulate the health and welfare of man;

[and] to enrich the understanding of the ecological systems and natural resources

important to the Nation." 42 U.S.C. § 4321.

31.     The Council on Environmental Quality ("CEQ"), established under NEPA

within the Executive Office of the President, is responsible for coordinating federal

environmental efforts and has promulgated regulations implementing NEPA. 40 C.F.R.

§§ 1500-1508.

11

32.     Executive Order 11,514 was promulgated "in furtherance of the purpose and policy of the National Environmental Policy Act of 1969." Exec. Order No. 11,514, 3 C.F.R. 531 (1971), *as amended by* Exec. Order 11,991, 3 C.F.R. 123 (1978). This executive order requires all Federal agencies to "[p]roceed, in coordination with other agencies, with actions required by section 102 of the Act," and to "comply with the regulations issued by the [CEQ] except where such compliance would be inconsistent with statutory requirements." *Id.* § 2(f), (g).

33.      "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and *before* actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added).

34.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the purpose and needs for, environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement ("EIS"). To determine whether a federal action will result in significant environmental impacts and requires an EIS, the federal agency may first conduct an environmental assessment ("EA"). 40 C.F.R. § 1501.4. If a federal agency makes a finding of no significant impact, it may avoid conducting an EIS. *Id.*

35.     The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). "Public scrutiny"

12

of this information is "essential to implementing NEPA." *Id*. Where the government has acted prior to fulfilling its NEPA obligations, projects authorized by government action must be suspended until NEPA's requirements are met.

36.     Agencies must integrate NEPA "at the earliest possible time to insure the planning and decisions reflect environmental values." 40 C.F.R. § 1501.2.

37.     Agencies shall not commit resources prejudicing the selection of alternatives prior to making a final decision. 40 C.F.R. § 1502.2(f). An EIS must assess the environmental impacts of proposed actions, rather than justifying decisions already made. 40 C.F.R. § 1502.2(g).

38.     An EIS must be prepared early enough "so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5.

39.     An agency must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Examination of alternatives is the "heart of the environmental impact statement" and must include a "no action" alternative. 40 C.F.R. § 1502.14(d). The "no action" alternative is foreclosed and meaningless if action is already occurring.

40.     The examination of alternatives must also include "appropriate mitigation measures not already included in the proposed action or alternatives." 40 C.F.R. § 1502.14(f).

41.     An agency must not prejudice or foreclose important choices during an ongoing NEPA review. Thus, an agency must take "appropriate action to insure that the

objectives and procedures of NEPA are achieved" when a non-Federal applicant is "about to take an action within the agency's jurisdiction" that would "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives" before the agency issues a record of decision on a project. 40 C.F.R. § 1506.1(a), (b).

42.     Connected actions or actions that result in cumulative impacts when viewed with other proposed actions should be discussed in the same EIS. 40 C.F.R. § 1508.25.

43.     An agency's NEPA obligations do not end with the initial NEPA analysis. NEPA imposes a mandatory and continuing duty to supplement previous environmental documents. If substantial changes are made, or there are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, the agency must prepare a supplement to the draft or final EIS. 40 C.F.R. § 1502.9(c).

44.     The State Department's own NEPA regulations, which incorporate and supplement the CEQ regulations, are set forth at 22 C.F.R. §§ 161.1-161.12.

**National Historic Preservation Act**

45.     Section 106 of NHPA requires federal agencies "take into account" the "effect" of any "undertaking" on properties "included in or eligible for inclusion in, the National Registry [of Historic Places]." Pub. L. No. 113-287 §§ 300308, 306108, 128 Stat. 3094, 3189–3227 (2014) (to be codified at 54 U.S.C. §§ 300308, 306108).[3]

_____

[3] Formerly 16 U.S.C. § 470f (2012).

46.     An "undertaking" includes a "project . . . requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

47.     NHPA regulations require an agency to consult with a number of specified parties to identify historic properties, assess the adverse effects that a proposed project would have on those properties, and "seek ways to avoid, minimize or mitigate any adverse effects." 36 C.F.R. § 800.1(a).

48.     This consultation process should "commence early in the planning process," *see, e.g.*, 36 C.F.R. § 800.1(a), and be completed "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c).

49.     The federal agency must consult with any tribe that "attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property." 36 C.F.R. §§ 800.2(c)(2)(i)(B)(ii), 800.2(a)(4).

50.     The agency must "ensure that consultation in the section 106 process provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A).

51.     The views of the public are "essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d). Agencies are required to "seek and consider the views of the public . . . ." *Id*.


**Executive Order 13,337 and Executive Order 11,423**

52.     Pipelines that cross into the United States from a neighboring country are subject to State Department permitting authority under Executive Order 13,337 and Executive Order 11,423. Executive Order 13,337 requires the Secretary of State to determine whether or not "the importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country" made possible by a pipeline project "serves the national interest" before granting a permit. 69 Fed. Reg. 25,299 (April 30, 2004).


**Administrative Procedure Act**

53.     The APA provides a right of action against final agency actions and decisions. 5 U.S.C. §§ 702, 704.

54.     Reviewing courts shall hold unlawful and set aside agency actions or decisions that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

55.     Reviewing courts shall also compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

**Freedom of Information Act**

56.    Upon request, FOIA requires agencies of the federal government to conduct a reasonable search for requested records and release them to the public, unless one of nine specific statutory exemptions applies. 5 U.S.C. § 552(a)(3), (b).

57.    An agency must respond to a party making a FOIA request within 20 working days, notifying the party of at least the agency's determination whether or not to fulfill the request, the reasons for that determination, and the requestor's right to appeal the agency's determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i). A requestor has exhausted administrative remedies "if the agency fails to comply with the" twenty day deadline. 5 U.S.C. § 552(a)(6)(C)(i). In that event, FOIA authorizes the requestor to invoke the jurisdiction of a federal court to obtain the requested records. 5 U.S.C. §552(a)(4)(B).

58.    In "unusual circumstances," an agency may delay its response to a FOIA request but it must provide notice and must also provide "the date on which the determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B)(i). The agency cannot specify a date "that would result in an extension for more than ten working days." *Id*.

59.    This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

60.    This Court may assess against the United States reasonable attorney fees and litigation costs incurred from a FOIA suit where the "complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i).


**FACTS**

**The New Pipeline Project**

61.    On March 4, 2014, Enbridge announced its plan to construct an entirely new crude oil pipeline (the "New Pipeline") that is able to import 800,000 bpd of heavy tar sands crude oil from Alberta, Canada to its terminal facility in Superior, Wisconsin. This New Pipeline will be constructed of new 36-inch diameter pipe except for a 17.5-mile segment that crosses the U.S.-Canada border (the "New Border Segment"). The New Border Segment has already been constructed with 34-inch diameter pipe.

62.    Enbridge claims that the New Pipeline is Line 3, an existing 34-inch diameter pipeline subject to a 1991 Presidential Permit. This Presidential Permit, however, authorizes "an existing 34-inch pipeline" and "any land, structures, installations or equipment appurtenant thereto . . . in the United States."

63.    Enbridge is in fact constructing an entirely new pipeline that will not follow the same route as Line 3 through parts of Minnesota and Wisconsin. Enbridge has indicated it will leave the existing 34-inch pipeline, including the U.S. portion of the border-crossing segment, in the ground and fill it with inert gas to prevent corrosion.

64.     The State Department has previously acknowledged that the impacts of constructing a pipeline of the size and capacity of the New Pipeline are significant and require an EIS pursuant to NEPA and consultation under NHPA.

65.     On June 3, 2014, Enbridge met privately with State Department officials to propose a "Bypass Project" (see below), which would import up to 800,000 bpd of heavy tar sands crude oil on the New Border Segment.

66.     By letter dated July 24, 2014, the State Department determined that Enbridge could operate the New Border Segment as proposed without further authorization, analysis of the environmental impacts, or NHPA consultation. The State Department did not issue a record of decision concerning the New Pipeline or the New Border Segment.

67.     The State Department has never analyzed the environmental impacts of the existing Line 3 under NEPA or examined the existing Line 3's impacts on historic and cultural resources under NHPA. Nor has the State Department completed NEPA review and NHPA consultation regarding the direct, indirect, cumulative, and reasonably foreseeable impacts of the New Border Segment and New Pipeline.

68.     Consequently, the State Department has approved the New Pipeline without first conducting any review of the environmental impacts as required by NEPA and State Department regulations, and without completing the consultation process required under NHPA.

69.     The New Pipeline is not authorized by any existing State Department permits.

**The Line 67 Expansion Project**

70.     Line 67 began operation in 2010 in the same right-of-way at the U.S.-Canada border as the existing Line 3. Enbridge operates Line 67 pursuant to a 2009 Presidential Permit which, in conjunction with its accompanying documents, limits the pipeline's capacity to import heavy tar sands crude oil to an annual average of 450,000 bpd. Although the 2009 Presidential Permit does not limit capacity on its face, the State Department has determined that Enbridge would need additional authority to import more than 450,000 bpd over Line 67.

71.     Enbridge proposed Line 67 in 2007 as a single, continuous 36-inch diameter pipeline that would run 1,000 miles from Hardisty, Alberta, Canada, to Enbridge's terminal facility in Superior, Wisconsin. The purpose of the project was to provide Enbridge the capacity to import an additional 450,000 bpd of heavy tar sands crude oil.

72.     The State Department described the project as "a new pipeline and associated facilities in both Canada and the United States. . . . The primary components of the U.S. portion of the pipeline would be the new pipeline, new mainline valves, and additional pumping capacity at three existing pump stations. The U.S. portion of the pipeline would extend approximately 326.9 miles from the U.S./Canada border near Neche, North Dakota through Minnesota and Wisconsin to the existing Enbridge terminal in Superior, Wisconsin." In analyzing the original Line 67 project, the State Department considered other pipelines in Enbridge's system, including the existing Line 3. The State Department rejected an alternative that would have replaced Line 3 with a larger pipeline.

20

The State Department determined that Line 3 was operating "at or near capacity" and that replacing Line 3 would require "removal of the old pipe."

73.    In 2009, following completion of its National Interest Determination, NHPA consultation, and FEIS, the State Department authorized the 450,000 bpd Line 67 proposal. The State Department determined its jurisdiction over Line 67 based on its ability to control crude oil imports over the pipeline. Consequently, the State Department limited the scope of the 2009 Presidential Permit, as well as the 450,000 bpd capacity limitation, to the three-mile segment of Line 67 from the U.S.-Canada border to the first mainline shutoff valve.

74.    In 2012, Enbridge sought authority from the State Department to increase the amount of crude oil it can import over Line 67 to an annual average of 800,000 bpd (the "Line 67 Expansion"). The Line 67 Expansion, as originally proposed, would not require any physical changes to the Line 67 pipe segments themselves. Rather, Enbridge would install additional pumps at new and existing pump stations. These pumps would increase the internal pressure of the pipeline to force a significantly higher volume of oil through the pipeline on a daily basis.

75.    Both Enbridge and the State Department consider this throughput increase a change in the operation of Line 67 at the U.S.-Canada border that requires an amended Presidential Permit.

76.    Enbridge is constructing two new crude oil storage tanks at its terminal facility in Superior, Wisconsin, to accommodate the increase in throughput from the Line

67 Expansion Project. These two tanks are approximately 55 feet tall, 286 feet in diameter, and together can store approximately 49 million gallons of crude oil.

77.     The additional crude oil throughput from the Line 67 Expansion will cause an increase in emissions of VOCs and hazardous air pollutants from tanks, piping, and related facilities at the terminal. These emissions include benzene, cyclohexane, ethylbenzene, n-hexane, toluene, and xylene.

78.     Benzene and other chemicals emitted from the Superior facility are known or suspected carcinogens. VOC emissions also contribute to ground level ozone and particulate matter, which are known to impact human health and the environment. VOC emissions from the throughput attributable to the Line 67 Expansion will exceed 40 tons per year. On March 15, 2013, the State Department published a Notice of Intent in the Federal Register alerting the public that it would prepare a Supplemental Environmental Impact Statement ("SEIS") before determining whether to authorize the Line 67 Expansion.

79.     The State Department acknowledged that the environmental impacts from the throughput increase are significant and were not considered in its earlier Final Environmental Impact Statement for Line 67 ("FEIS"). Therefore, the State Department has determined that in order to comply with NEPA it must first complete an SEIS before authorizing the Line 67 Expansion. The State Department has not completed the SEIS nor issued an record of decision concerning the Line 67 Expansion Project.

The State Department also recognized the potential impacts on cultural and historic resources, and determined that the Line 67 Expansion requires consultation pursuant to NHPA.

**The Bypass Project**

80.     Enbridge is unwilling to wait for the State Department to complete the SEIS and NHPA consultation for the proposed Line 67 Expansion before expanding the capacity of Line 67 to 800,000 bpd.

81.     On June 16, 2014, Enbridge wrote the State Department describing the Bypass Project, a plan to use the New Border Segment as a second border-crossing pipeline for Line 67. Enbridge will divert up to 800,000 bpd of crude oil from Line 67 onto the New Border Segment north of the border and then re-route it back onto Line 67 south of the border.

82.     The Bypass Project is intended to circumvent the throughput limit placed on the first three miles of the Line 67 pipeline in the United States, which the State Department established based on the original Line 67 project configuration. Enbridge plans to rely on its alleged authority in the existing Presidential Permit for Line 3 to import 800,000 bpd on the New Border Segment. Enbridge plans to use the Bypass Project to circumvent the ongoing State Department NEPA review and NHPA consultation processes for the Line 67 Expansion.

83.     In all respects, except for the diversion and construction of the New Border Segment, the Bypass Project will be the operational and functional equivalent of the proposed Line 67 Expansion.

84.     By a July 24, 2014 letter, the State Department determined that the Bypass Project would become part of Enbridge's Presidential Permit application for the Line 67 Expansion. The State Department further determined it would inform the public and agencies of this decision by publishing a Notice of Intent in the Federal Register. By the same letter, the State Department determined that the Bypass Project did not require further approval, thereby authorizing Enbridge to construct the New Border Segment and operate it at a level of 800,000 bpd.

85.     Like the proposed Line 67 Expansion, the Bypass Project will result in significant environmental impacts, including impacts from importing up to 800,000 bpd of heavy tar sands crude oil. The State Department has not considered whether the Bypass Project prejudices the choice of reasonable alternatives or has an adverse environmental impacts.

86.     As with the New Pipeline, the State Department has not completed any NEPA review of the environmental impacts from the Bypass Project. The State Department has also not completed NHPA consultations to assess and mitigate the Bypass Project's impacts on the region's cultural and historic resources. Nor has the State Department issued a record of decision concerning the Line 67 Expansion or Bypass Project.

87.     Once the Bypass Project is operational, shippers and refineries will rely on the additional volumes of oil and the State Department will face increased pressure to approve the Line 67 Expansion.

**Adverse Impacts**

88.     The interests of Plaintiffs and Plaintiffs' members have been and will continue to be adversely affected by the State Department's decision. The State Department's authorization of the New Pipeline, Line 67 Expansion, and Bypass Project allows a significant expansion of tar sands oil crossing North Dakota, Minnesota, and Wisconsin to move forward prior to analyzing and disclosing the projects' environmental impacts and effects on cultural and historic resources. Plaintiffs' members face increased risk of harm to their health, recreational, economic, aesthetic, cultural, traditional, and other interests as a result of the State Department's decision. These are actual, concrete injuries caused by the State Department's failure and refusal to comply with NEPA, NHPA, State Department regulations, and FOIA as alleged herein.

89.     Line 67 and the New Pipeline cross or will cross many areas in Minnesota and Wisconsin in which Plaintiffs' members recreate, including the Mississippi River, Sand Lake, Shallow Lake, Winnie Lake, Lake Winnibigoshish, Jay Cooke State Park, Leech Lake, and McGregor Marsh. The pipelines will also cross the 1855 Treaty Territory, in which White Earth Nation's members continue traditional activities such as hunting, fishing, and gathering wild rice.

90.     Construction of the New Pipeline, Line 67 Expansion, and Bypass Project will likely degrade water quality and damage aquatic habitat. Construction activity will likely increase sedimentation and erosion and, in some cases, reduce in-stream water flow. Construction could affect fisheries resources by altering or destroying habitat, reducing spawning success, and introducing toxic materials into aquatic ecosystems.

91.     The construction of the New Pipeline, Line 67 Expansion, and Bypass Project will also harm wildlife resources and plant communities through cutting, clearing, wildlife habitat fragmentation, and the introduction of noxious weeds.

92.     Some of Plaintiffs' members live within the immediate vicinity of Enbridge's terminal facility in Superior, Wisconsin, where the Bypass Project and the New Pipeline will cause additional emissions of VOCs and hazardous air pollutants from tanks, piping, and related facilities at the terminal.

93.     VOC emissions from the additional throughput attributable to the New Pipeline will exceed 40 tons per year. VOC emissions from the additional throughput attributable to the Line 67 Expansion will exceed 40 tons per year whether the oil flows over the New Border Segment or the Line 67 border-crossing segment.

94.     VOC emissions contribute to ground level ozone and particulate matter, which are known to impact human health and the environment. Emissions from Enbridge's terminal facility will also include hazardous air pollutants such as benzene, cyclohexane, ethylbenzene, n-hexane, toluene, and xylene.

26

95.     The increase in the amount of crude oil stored at Enbridge's terminal facility in Superior increases the risk and extent of damage to human health and the environment that could occur at the facility in the event of an accident.

96.     The New Pipeline, Line 67 Expansion, and Bypass Project present significant risks to the environment and human health due to operational leaks and spills. Enbridge reports over 30 incidents of leaks and spills on its existing pipeline running through northern Minnesota over the last decade. In 2010, an Enbridge pipeline suffered a catastrophic failure near Kalamazoo, Michigan and spilled over 800,000 gallons of tar sands oil into a tributary of the Kalamazoo River. On July 12, 2012, another Enbridge pipeline failed near Grand Marsh, Wisconsin spilling an estimated 37,800 gallons of crude oil into the environment. Plaintiffs' members who live and/or recreate near the proposed route for the New Pipeline and the existing route of Line 67 are aware of these incidents. Plaintiffs' members therefore rely on public NEPA and NHPA processes to inform themselves and the decisionmakers of the risks they face and the measures Enbridge will take to mitigate those risks.

97.     The State Department's failure to comply with NEPA, NHPA, and State Department regulations increases the risk that environmental harm will occur due to inadequate foresight and deliberation. The State Department lacks the information it needs to properly assess possible impacts of the Line 67 Expansion, Bypass Project, and New Pipeline on Plaintiffs' members' recreational, cultural, spiritual, and economic interests. The State Department also lacks the information necessary to adequately mitigate these projects' environmental risks.

98.     The State Department's failure to comply with NEPA, NHPA, and State Department regulations denies Plaintiffs and Plaintiffs' members the ability to adequately participate in the required public review process before the challenged project can proceed. These violations also deny Plaintiffs access to information concerning the purpose and need, design, construction, operation, and environmental impacts of the challenged project.

99.     Members of Plaintiffs Center for Biological Diversity and Sierra Club, and their interests in this area, are further harmed by the State Department's failure and refusal to respond to the organizations' related FOIA requests.


**Sierra Club Freedom of Information Act Requests**

100.     On March 25, 2014, Sierra Club submitted a FOIA request to the State Department seeking release of records pertaining to Enbridge's Line 3 pipeline.

101.     On April 9, 2014, the State Department responded to Sierra Club's March 25, 2014 FOIA request by noting it received the request and that it was processing it. The State Department also stated that unusual circumstances could cause delay. The State Department did not say whether it would grant or deny the request.

102.     Sierra Club emailed the State Department on September 2, 2014 and on October 23, 2014 requesting the status of its March 25, 2014 FOIA request.

103.     On both occasions, the State Department responded to Sierra Club that it is still processing the request.

104.    To date, the State Department has not provided Sierra Club with a single record, an explanation for the delay, or an estimated date as to when it will decide to approve or deny the March 25, 2014 FOIA request.

105.    On September 5, 2014, Sierra Club submitted a second FOIA request to the State Department, seeking release of records regarding Enbridge's Line 3, Line 67, and the Bypass Project.

106.    The State Department responded noting that it received the request and that it was processing it. The State Department also stated that unusual circumstances could cause delay. The State Department did not state whether it would grant or deny the FOIA request.

107.     Sierra Club emailed the State Department on October 23, 2014, asking for the status of its September 5, 2014 FOIA request.

108.    On October 29, 2014, the State Department provided Sierra Club with an estimated completion date for its second FOIA request of May 2015, which is well beyond the 20-day limit for the State Department to issue its determination and beyond the 10-day limit for an extension caused by unusual circumstances.

109.    To date, the State Department has not provided Sierra Club with a single record, an explanation for the delay, or an adequate estimated date as to when it will decide whether to grant or deny the request.

**Center for Biological Diversity Freedom of Information Act Request**

110.    On May 30, 2014, the Center for Biological Diversity ("Center") submitted a FOIA request to the State Department seeking the release of records regarding the New Pipeline project.

111.    The State Department responded to the Center on June 12, 2014 by letter stating that it received the request and that it was processing it. The State Department also stated that unusual circumstances could cause delay. The State Department did not state whether it would grant or deny the request

To date, the State Department has not provided the Center with a single record, an explanation for the delay, or an estimated date as to when it will decide whether to grant or deny the request.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violation of NEPA, NHPA, and the APA:
#### The New Pipeline and New Border Segment

112.    Plaintiffs incorporate and re-allege all allegations contained in the preceding paragraphs.

113.    The State Department's July 24, 2014 decision to approve construction and operation of the New Border Segment to import 800,000 bpd constitutes approval and authorization of the New Pipeline, including the New Border Segment. This decision will result in significant environmental impacts through new ground disturbance, by

substantially increasing the amount of heavy tar sands crude oil transported across North Dakota, Minnesota, and into Wisconsin, and by increasing emissions from the Superior terminal facility.

114.    The State Department's July 24, 2014 decision therefore constitutes major federal action under NEPA. 40 C.F.R. § 1508.18.

115.    The New Border Segment, New Pipeline, Bypass Project, and Line 67 Expansion are all connected and cumulative actions, requiring their consideration by the State Department in a single EIS. 40 C.F.R. §§ 1501.7, 1508.25; *see* 40 C.F.R. § 1502.4.

116.    The State Department has not analyzed the environmental impacts of the construction and operation of the New Border Segment or the New Pipeline. The State Department violated NEPA by failing to require an EA or EIS to involve the public and analyze the potential environmental impacts that may result from the construction and operation of the New Pipeline, including the New Border Segment, prior to authorizing and allowing this project to proceed. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1501.4, 1501.2, 1502.2(f), 1502.5, 1502.14(d), 1506.1(a)-(b), 1508.25; 22 C.F.R. §§ 161.1-12.

117.    The State Department's approval and authorization of the New Pipeline, including the New Border Segment, without compliance with NEPA is arbitrary, capricious, an abuse of discretion, not in accordance with NEPA, and without observance of the procedures required by NEPA. 5 U.S.C. § 706(2).

118.    The State Department's failure to prepare any NEPA analysis for the New Pipeline, including the New Border Segment, constitutes agency action unlawfully withheld and unreasonably delayed. 5 U.S.C. § 706(1).

119.    The State Department's approval and authorization of the New Pipeline, including the New Border Segment, also constitutes an undertaking under NHPA because it is a project or activity under the agency's direct or indirect jurisdiction. 36 C.F.R. § 800.16(y). The New Pipeline has the potential to cause effects on historic property within the meaning of NHPA because of the threats it poses to the 1855 Treaty Territory, which holds religious and cultural significance for White Earth Nation, its members, and members of other Plaintiff organizations. 36 C.F.R. §§ 800.16(i), (l)(1).

120.    The State Department is therefore required to consult with White Earth Nation and to ensure it has "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A). NHPA requires that an agency complete the consultation process prior to engaging in an undertaking. Pub. L. No. 113-287 §§ 300308, 306108, 128 Stat. 3094, 3189–3227 (2014) (to be codified at 54 U.S.C. §§ 300308, 306108); 36 C.F.R. § 800.1(c).

121.    The State Department did not engage in the required consultation process prior to the construction and operation of the New Border Segment and New Pipeline. The State Department's approval and authorization of the New Pipeline, including the New Border Segment, is thus arbitrary, capricious, an abuse of discretion, not in

accordance with NHPA, and without observance of the procedures required by NHPA. 36

C.F.R. § 800.3; 5 U.S.C. § 706(2).


## SECOND CLAIM FOR RELIEF

### Violation of NEPA, NHPA, and the APA:
### Bypass Project and Line 67 Expansion

122.    Plaintiffs incorporate and re-allege all allegations contained in the

preceding paragraphs.

123.    NEPA prohibits the State Department from taking any action concerning a

proposal that would "[h]ave an adverse environmental impact" or "[l]imit the choice of

reasonable alternatives" before the agency has issued a record of decision. 40 C.F.R.

§ 1506.1(a).

124.    NEPA further requires the State Department to take "appropriate action to

insure the objectives and procedures of NEPA are achieved." 40 C.F.R. § 1506.1(b). This

requirement is triggered when "an agency is considering an application from a non-

Federal entity, and is aware that the applicant is about to take an action within the

agency's jurisdiction" that would have "an adverse environmental impact" or "[l]imit the

choice of reasonable alternatives" before the agency issues a record of decision on any

action requiring an EIS. 40 C.F.R. § 1506.1(a), (b).

125.    The Bypass Project is within the State Department's jurisdiction because it

involves construction and operation of a cross-border pipeline to increase imports of

crude oil into the United States.

126.    The Bypass Project will have adverse environmental impacts. The State Department has determined that environmental impacts from the Line 67 Expansion are significant within the meaning of NEPA. The Bypass Project would allow Line 67 to operate at the maximum capacity being considered in the proposal for the Line 67 Expansion, and therefore result in environmental impacts including all of the impacts of the proposed Line 67 Expansion.

127.    The State Department's approval of the Bypass Project also eliminates the choice of reasonable alternatives for the proposed Line 67 Expansion. By approving an annual average delivery of 800,000 bpd at the terminus of Line 67 in Superior, the State Department will have prejudiced or substantially foreclosed the possibility of choosing the "no action alternative," which is the heart of NEPA's environmental review. 40 C.F.R. § 1502.14(d). Once the Bypass Project is operational, Line 67 will already be operating at the increased level supposedly being evaluated by the ongoing SEIS for the Line 67 Expansion. Shippers and refineries will rely on the additional volumes of oil, and the State Department will face undue pressure to approve the Line 67 Expansion Project.

128.    The State Department has taken no action to insure NEPA's objectives and procedures are achieved. Its approval of the Bypass Project insures that NEPA's fundamental requirement to "look before you leap" will not be met.

129.    In authorizing the Bypass Project to proceed prior to the completion of the ongoing NEPA process for the Line 67 Expansion, the State Department has violated and remains in violation of NEPA and State Department regulations. 40 C.F.R. §§ 1500.1(b), 1501.2, 1502.2(f), (g), 1502.5, 1506.1, 1508.25; 22 C.F.R. §§ 161.1-12. The State

Department's approval and authorization of the Bypass Project is arbitrary, capricious, an abuse of discretion, not in accordance with NEPA, and without observance of the procedures required by NEPA. 5 U.S.C. § 706(2).

130.     Moreover, the State Department's failure to take appropriate action to insure that the objectives and procedures of NEPA are achieved for the Line 67 Expansion and the Bypass Project constitutes agency action unlawfully withheld and unreasonably delayed. 5 U.S.C. § 706(1).

131.     The State Department violated Section 106 of NHPA, which requires an agency engaged in an undertaking to complete the necessary consultation process prior to authorizing an undertaking. Pub. L. No. 113-287 §§ 300308, 306108, 128 Stat. 3094, 3189-3227 (2014) (to be codified at 54 U.S.C. §§ 300308, 306108); *see* 36 C.F.R. § 800.1(c). The NHPA consultation process regarding the Line 67 Expansion remains ongoing.

132.     The State Department's authorization of the Bypass Project and Line 67 Expansion Project before completing the required consultation is arbitrary, capricious, an abuse of discretion, not in accordance with the NHPA, and without observance of the procedures required by the NHPA. 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

### Violation of FOIA:
### Failure to Provide Responsive Records

133.    Plaintiffs Center for Biological Diversity and Sierra Club incorporate and re-allege all allegations contained in the preceding paragraphs.

134.    By failing to provide the records responsive to the Center for Biological Diversity's May 30, 2014 and Sierra Club's March 25, 2014 and September 5, 2014 FOIA requests the State Department is violating the FOIA and its own implementing regulations. 5 U.S.C. § 552(a)(3)(A); 22 C.F.R. § 171.12(d).

135.    By failing to respond to the Center for Biological Diversity's May 30, 2014 FOIA request and Sierra Club's March 25, 2014 and September 5, 2014 FOIA requests within the requisite 20 day period with a determination, reasons for that determination, and a notification of the right to appeal, the State Department violated FOIA. 5 U.S.C. § 552(a)(6)(A)(i).

136.    In the alternative, if the State Department is claiming delay due to unusual circumstances, it is still in violation of FOIA and its own implementing regulations for not providing the Center and Sierra Club with a written notice of an extension and for not providing an estimated date within the allowable 10 day extension period upon which the State Department will make its determination. 5 U.S.C. § 552(a)(6)(B)(i); 22 C.F.R. §171.12(d).

137.    By not notifying the Center and Sierra Club that it cannot process the request within the extended time period due to unusual circumstances and not providing

36

these organizations an opportunity to narrow its request, the State Department is in

violation of FOIA. 5 U.S.C. § 552(a)(6)(B)(i).


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that the State Department is in violation of NEPA, NHPA, and the

APA;

B.      Set aside the State Department's approval and authorization of the Bypass

Project and New Pipeline, including the New Border Segment, and Line 67 Expansion;

C.      Issue a permanent injunction prohibiting the use of the New Border

Segment to increase throughput on Line 67 beyond 450,000 bpd, and prohibiting

construction of the New Pipeline, until the Department has complied with NEPA, NHPA,

and State Department regulations by completing the SEIS for the Line 67 Expansion and

Bypass Project, and the required NEPA and NHPA review of the New Pipeline, and

issuing a record of decision for each;

D.      Declare that the State Department is in violation of FOIA regarding the

FOIA requests by Plaintiffs Center for Biological Diversity and Sierra Club, and compel

the State Department to promptly respond to the outstanding requests for information;

E.      Award to Plaintiffs their costs, expenses, expert witness fees, and

reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412

and FOIA, 5 U.S.C. § 552(a)(4)(E);

F.      Grant Plaintiffs such further relief as may be just, proper, and equitable.

Respectfully submitted,

s/ Kenneth J. Rumelt
Kenneth J. Rumelt
VT Bar Number 4801 (*pro hac vice*)
Vermont Law School
PO Box 96 164 Chelsea Street
South Royalton, VT 05068
Telephone: 802-831-1630
Fax: 802-831-1631
krumelt@vermontlaw.edu

Marc D. Fink
MN Bar No. 034307
Center for Biological Diversity
209 East 7th St.
Duluth, MN 55805
Telephone: 218-464-0539
mfink@biologicaldiversity.org

Attorneys for Plaintiffs

Dated: February 20, 2015