# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

White Earth Nation, et al.,

     Plaintiffs,

v.

John Kerry, in his official capacity
as Secretary of State, and the United
States Department of State,

     Defendants,

and

Enbridge Energy, Ltd Partnership,

     Intervenor-Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-4726 (MJD/LIB)

_____

Kenneth J. Rumelt, Environmental and Natural Resources Law Clinic Vermont Law School, Marc D. Fink, Center for Biological Diversity, Douglas P. Hayes, Sierra Club and James G. Murphy, National Wildlife Federation, Counsel for Plaintiffs.

Craig R. Baune and Pamela Marantette, Assistant United States Attorneys, John C. Cruden, Assistant Attorney General, Luther L. Hajek, Trial Attorney, United States Department of Justice, Counsel for Defendants.

Todd Wind and Joseph J. Cassioppi, Fredrikson & Byron, P.A. and David H. Coburn, Cynthia Taub and Joshua Runyan, Steptoe & Johnson LLP, Counsel for Enbridge Energy, Ltd. Partnership.

_____

This matter is before the Court on Plaintiffs' motion for partial summary judgment [Doc. No. 69], Defendants John Kerry, Secretary of State and the United States Department of State's ("State Department") motion to strike pleadings [Doc. No. 84], Intervenor Enbridge Energy, Limited Partnership's ("Enbridge") motion for partial summary judgment [Doc. No. 88], the State Department's motion for summary judgment on counts one and two [Doc. No. 92], Plaintiffs' motion for leave to file an opposition to Enbridge's memorandum in support of motion to strike [Doc. No. 99], and the State Department's motion for leave to submit additional authority [Doc. No. 110].

## I.   Summary of Decision

This case involves two oil pipelines owned and operated by Enbridge that cross the United States/Canada border and the plans to maintain/replace a major segment of one of the pipelines and to expand the capacity of the other.  With respect to these projects, Enbridge has replaced the border segment on one line and has installed interconnections between the two lines on both sides of the border.  Plaintiffs claim that the State Department approved the border segment replacement and the interconnections and that such approval violated the requirements of the National Environmental Policy Act ("NEPA") and the

2

National Historic Preservation Act ("NHPA").  Plaintiffs ask the Court for an

order prohibiting the use of the new border segment and the interconnections

until the State Department has complied with NEPA and NHPA.  As will be

discussed below, Plaintiffs are not entitled to such relief as the challenged actions

of the State Department are not subject to judicial review.

## II.    Background

Enbridge owns and operates multiple pipeline facilities, two of which are

at issue in this case.  Line 3 and Line 67 (also known as the Alberta Clipper

Pipeline) follow the same route, are approximately 1,000 miles long and transport

crude oil from Alberta, Canada to Superior, Wisconsin.  Line 3 was constructed in

the late 60's and construction for Line 67 began in August 2009.  Both lines cross

the border between Canada and the United States, and are thus subject to the

President's inherent constitutional authority concerning foreign relations.

Accordingly, before Line 3 could be constructed over the international border, it

was necessary to obtain a Presidential Permit.

The Presidential Permit for Line 3 was issued in January 1968, and it

authorized the construction, operation and maintenance of facilities "at the

international boundary line between the United States and Canada in Pembina

County, North Dakota, and to connect such facilities with like facilities in the

Province of Manitoba." (AR[1] 1-5.) The Permit describes a "34 inch pipeline for

crude oil and other liquid hydrocarbons manufactured and installed

substantially as described in the attached application." (AR 1.) The Permit

further required the pipeline facilities be maintained in a condition of good

repair, and that the "permittee take reasonable precautions to prevent and

suppress fires, explosions or leakage and to avert any conditions on the land

traversed or waters affected . . . which might endanger the safety of these

facilities." (AR 4.)

In August 1968, President Johnson delegated to the Secretary of State his

authority to grant or deny permits for certain types of border crossing facilities,

including oil pipelines. See Executive Order 11423 § 1(a), 33 Fed. Reg. 11,741

(Aug. 16, 1968). Pursuant to this delegation, the State Department issued a new

Presidential Permit for Line 3 in 1991 when the pipeline facilities were transferred

to new owners. (AR 6-10.) The 1991 Permit has substantially the same conditions

as the original permit. (See Id.)

The permitting process was revised in 2004 in order to:

---

[1]AR refers to the Administrative Record.

expedite reviews of permits as necessary to accelerate the completion of energy production and transmission projects, and to provide a systematic method for evaluating and permitting the construction and maintenance of certain border crossings for land transportation, including motor and rail vehicles, that do not require construction or maintenance of facilities connecting the United States with a foreign country, while maintaining safety, public health, and environmental protections.

Executive Order 13337, 69 Fed. Reg. 25299 (Apr. 30, 2004).  To achieve these goals, the Order provides that "the Secretary of State is designated and empowered to receive all applications for Presidential permits . . . for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels to or from a foreign country."  Exec. Order 13337, § 1(a).  Once an application is received, the Secretary shall request additional information if needed, and then refer the application to other agencies such as the Secretary of Defense, Attorney General, Secretary of the Interior, Secretary of Commerce, and Secretary of Transportation for their views on the application.  Id. § 1(b).  After considering all pertinent information and the views of other agency heads, the State Department shall determine whether allowing a border crossing for purposes of transporting petroleum products would "serve the national interest"

and what conditions, if any, should apply.  Id. § 1(g)-(h).  The determination

becomes final after other agency heads have had the opportunity to object, and if

necessary, to refer the matter to the President for final determination.  Id. § 1(h).

The Order further provides that it does not create any rights that are "enforceable

at law or in equity by any party against the United States."  Id. § 6.

Line 67 is subject to a Presidential Permit issued in 2009 that covers "a 36

inch diameter pipeline extending from the United States - Canada border near

Neches, North Dakota, up to and including the first mainline shut-off valve or

pumping station in the United States."  (AR 72.)  Prior to the issuance of the Line

67 Permit, the State Department prepared a final environmental impact statement

("FEIS") pursuant to NEPA and NHPA.  (AR 73.)  The FEIS considered

construction impacts along the entire U.S. portion of the pipeline as well as

impacts from operating Line 67 at an annual average capacity of 450,000 barrels

per day ("bpd").  (AR 280.)

### A.    Line 3 Replacement

In 2014, Enbridge informed the State Department that Line 3 was in need

of maintenance, and that it was undertaking a "maintenance-driven replacement

of Line 3 that includes the portion operated and maintained pursuant to the 1991

Presidential Permit, namely the approximately 16-mile section that extends from the U.S.-Canada border to the current first mainline valve in the United States" (referred to herein as the "Line 3 Replacement ").  (AR 22 (Letter from Enbridge to Department dated February 5, 2014).)  Enbridge further informed the State Department that for safety reasons, it was currently operating Line 3 at a reduced average annual capacity.  (AR 23.)  Enbridge noted the maintenance activities would be undertaken in accordance with the terms of the 1991 Presidential Permit such that the replacement pipe in the border segment would be of the same diameter as the original pipe, be placed in the same right of way and would comply with all applicable Pipeline and Hazardous Materials Safety Administration ("PHMSA") design and safety standards.  (Id.)  Enbridge further assured that the existing Line 3 border segment would be deactivated and continuously maintained in place in accordance with relevant regulations.[2]  (Id.)

In a follow-up letter dated March 17, 2014, Enbridge provided additional information in response to requests from the State Department, including that it planned to replace the remainder of Line 3 outside of the border segment and that the non-border segments would be constructed with 36 inch diameter pipe.

---

[2]49 C.F.R. § 195.59 regulates the abandonment and deactivation of pipeline facilities.

(AR 31-33.)  Enbridge further indicated that the larger replacement project "has an in-service date of 2017, subject to obtaining certain permits and approvals required in the U.S. and Canada." (AR 32.)  Enbridge also indicated there may be a route deviation for Line 3 beginning 120 miles from the border, which would follow the proposed route of a planned new pipeline known as the Sandpiper Pipeline to Superior, Wisconsin.  (AR 33.)

Enbridge also provided background information as to the types of crude oil that had been transported on Line 3, as well as the historical operating capacity of that line.  (AR 32.)  It noted that when the line first went into service, Line 3 transported only light crudes, but in the early 1980s, the line began to transport light, medium and heavy crudes.  (Id.)  The average annual operating capacity of Line 3 also varied and has ranged from 390,000 bpd for heavy crudes, to a much higher bpd capacity, up to 960,000 bpd for light crude.  (AR 32-33 n.2.)

Enbridge also noted that once all segments of the line are replaced, the average annual capacity would be 760,000 bpd, based on the assumption that the line will transport a mixture of heavy and light crude oils. (AR 33.)  Because of safety concerns of the older pipeline, Enbridge noted the capacity is currently limited to 390,000 bpd.  (Id.)  Enbridge further indicated it would be "working

with those agencies that have jurisdiction over the portions of Line 3 outside of

the border area to obtain required permits for construction in both the existing

Line 3 corridor and the proposed new corridor, including the Minnesota Public

Utilities Commission ["MPUC"]."  (AR 34.)

In a letter dated April 24, 2014, the State Department informed Enbridge

that based on the information submitted, the proposed replacement of the Line 3

border segment - that portion of Line 3 from the Canadian/United States border

to the mainline valve at approximately mile 16 - is consistent with the

authorizations in the existing 1991 President Permit.  (AR 43)  The State

Department also confirmed for Enbridge that the 34-inch pipe diameter

descriptor in the Permit only applies to that same 16-mile segment. (AR 44.)

### B.    Line 67 Expansion and Bypass Project

In November 2012, Enbridge submitted an application for an amendment

to the August 3, 2009 Presidential Permit to allow it to increase the volume of the

oil transported across the border on Line 67 up to an annual average of 800,000

bpd to meet the rising demands for additional transportation capacity for crude

oil from Western Canada (referred to herein as the "Expansion Project").  (AR

105-24.)  The Expansion Project would not require any physical changes to Line

67's pipe segments; instead Enbridge would use extremely high operating pressures to increase the volume. (AR 110.) In March 2013, the State Department initiated a process for preparing a supplemental environmental impact statement ("SEIS") in order to evaluate the request for expansion. See 78 Fed. Reg. 16,565 (Mar. 15, 2013); 78 Fed. Reg. 26,101 (May 3, 2013). The State Department has not made a decision regarding the Expansion Project and the environmental review is ongoing.

In June 2014, Enbridge informed the State Department that it planned to construct interconnections between Lines 3 and 67 (referred to as the "Bypass Project"). (AR 128-29.) One set of interconnections would be placed on the Canadian side of the border and the second set would be placed outside of the border segment in the United States. Id. Enbridge desired to construct these interconnections to provide it greater flexibility in using the pipelines while the SEIS is pending. (AR 129.) For example, it would allow Enbridge to transfer oil north of the border from Line 67 to Line 3, and then transfer it back to Line 67 at a point in the United States after passing through the border segment. (AR 128-29.) Such a transfer would allow Enbridge to increase volume on Line 67 south of the border segment, initially to 570,000 bpd, and later to 800,000 bpd assuming

additional permissions are received from the MPUC and the U.S. Army Corps of

Engineers, while abiding by the requirement of the 2009 Presidential Permit to

keep the volume on Line 67 through the border segment below 500,000 bpd.  (AR

129.)

In a follow-up letter to the State Department, Enbridge provided additional

information regarding the planned construction of the interconnections.  (AR

133.)  It explained that it had obtained all the necessary approvals, including

authorization from the MPUC, to transport up to 570,000 bpd on Line 67 south of

the border segment and that it planned to increase the flow up to 800,000 bpd by

mid-2015.  (AR 135-36.)

By letter dated July 24, 2014, the State Department informed Enbridge of its

finding that the interconnections between Lines 67 and 3 do not require

authorization from the State Department, as they are located outside of the

border segments for both lines.  (AR 193-94.)  The State Department further

indicated that it would take the information submitted regarding the

interconnections into account in its environmental analysis of the Expansion

Project.  (<u>Id.</u>)

11

## C.    Plaintiffs' Claims

In Counts One and Two of the First Amended Complaint, Plaintiffs allege

that the State Department's July 24, 2014 decision, that it need not authorize the

Bypass Project, and its April 24, 2014 decision, that the Replacement Project was

consistent with the existing Line 3 Permit, violated NEPA, NHPA and the

Administrative Procedures Act ("APA"), 5 U.S.C § 701 et seq., by: 1) authorizing

new, high-capacity pipelines without any NEPA or NHPA compliance; and 2)

short circuiting an ongoing NEPA and NHPA review of the Expansion Project.

Plaintiffs assert these violations have silenced public participation and placed

resources at risk that are vitally important to Plaintiffs and their members.[3]

Plaintiffs request that the Court issue a declaration that the State

Department has violated NEPA, NHPA and the APA and set aside the State

Department's approval and authorization of the Bypass, Replacement and

Expansion Projects.  Plaintiffs further request a permanent injunction prohibiting

the use of the new Border Segment to increase throughput on Line 67 beyond

---

[3]In Count Three, Plaintiffs Center for Biological Diversity and the Sierra Club allege that the State Department has violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (a)(6)(A)(i), by failing to provide them records responsive to the FOIA requests.   This count is not subject to the motions currently before the Court.

450,000 bpd and prohibiting construction of the New Pipeline until the State

Department has complied with NEPA, NHPA and State Department regulations

by completing the SEIS for the Expansion and Bypass Project and the required

NEPA and NHPA review of the New Pipeline and issuing a record decision for

each.

## III.   Standard of Review

Plaintiffs' claims of violations of the NEPA and NHPA are brought

pursuant to the APA which provides for a private right of action and a waiver of

sovereign immunity for claims challenging agency action.  5 U.S.C. § 702.

Review of agency action is limited to "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a

court."  5 U.S.C.A. § 704.  Such review is limited to the administrative record.  See

United States v. Massey, 380 F.3d 437, 440 (8th Cir. 2004).

"To the extent necessary to decision and when presented, the reviewing

court shall decide all relevant questions of law, interpret constitutional and

statutory provisions, and determine the meaning or applicability of the terms of

an agency action" and shall "compel agency action that is unlawfully withheld"

and set aside agency action that is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law or without proper observance of procedure as required by law.  5 U.S.C. § 706 (1), (2)(A) and (D).  5 U.S.C. § 706(1).

"While it is true that courts should not 'rubber-stamp * * * administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute' it is equally well established that great deference should be accorded an administrative agency's interpretation of its own regulations." Moore v. Custis, 736 F.2d 1260, 1262 (8th Cir. 1984) (internal citations omitted).  The "standard of review is a narrow one, and the court is not permitted to substitute its judgment for that of the agency." Massey, 380 F.3d at 440.  The burden is on the party challenging agency action to prove the agency action was arbitrary or capricious.  Id.

## IV.    Discussion

### A.    NEPA

NEPA requires a thorough environmental review of all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This review must be timely and be taken objectively and in good faith. Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000).  NEPA procedures insure that environmental information is available to public officials and citizens

14

before decisions are made and before actions are taken.  40 CFR § 1500.1(b).

Assessments must be prepared early enough so that it can serve practically as an

important contribution to the decisionmaking process and will not be used to

rationalize or justify decisions already made.  Metcalf, 214 F.3d at 1142.

Plaintiffs assert the State Department authorized the Bypass Project before

completing its ongoing SEIS for the Line 67 Expansion Project.  Initially, the State

Department committed itself to a thorough public review of the Expansion

Project's environmental impacts.  Plaintiffs assert that when Enbridge grew tired

of the process, it devised the Bypass Project to circumvent NEPA.  Plaintiffs

assert the State Department turned what had been a public review of the

Expansion Project into a closed door discussion with Enbridge and authorized

the Bypass Project in its July 24, 2014 letter, substantially prejudicing the ongoing

SEIS.

Plaintiffs further assert that the State Department violated NEPA by

approving the Line 3 Replacement.  Plaintiffs characterize the replacement as a

new pipeline; therefore, it is a major federal action that significantly affects the

quality of the human environment.  Plaintiffs argue this project is a new pipeline,

not a mere replacement of Line 3: it will operate at a higher capacity, it is larger in

diameter for all but the 16 mile border segment, it has thicker walls and can

operate at high pressures and it will follow a different route for hundreds of

miles.  Such a project may significantly affect the environment, and similar

projects have triggered NEPA review. (See e.g., AR 222-522.)  The PHMSA was

informed in March 2014 that the replacement of Line 3 "would likely require an

environmental review under NEPA."  (AR 29.)

> **B.     NHPA**

NHPA obligates federal agencies to "assume responsibility for the

preservation of historic properties" under their control and requires that federal

agencies having authority to license any undertaking, prior to the issuance of any

license, shall take into account the effect of the undertaking on historic properties.

54 U.S.C. § 306108; 36 CFR § 800.1.  The timing requirement ensures the agency

considers a broad range of alternatives, including no action, and to avoid,

minimize or mitigate the undertaking's adverse effects to historic properties.  See

36 CFR § 800.1(c); Pueblo of Sandia v. United States, 50 F.3d 856, 859-62 (10th Cir.

1995).

An undertaking includes "a project . . . under the direct or indirect

jurisdiction of a Federal agency , including . . . those requiring a Federal permit,

license or approval."  36 CFR § 800.16 (y).  NHPA consultation is necessary "as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals."  Vieux Carre Prop. Owners Residents & Assoc. v. Brown, 948 F.2d 1436, 1445 (5th Cir. 1991).

NHPA regulations carve out a detailed consultation process for Native American Tribes.  36 CFR § 800.2(c)(2)(ii).  This requirement applies, even if the location of the historic property is off tribal lands.  36 CFR § 800.2 (c)(2)(ii)(D).  Agencies shall ensure the consultation process provides a tribe with a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, articulate its views on the undertaking's effects on such properties and participate in the resolution of adverse effects.  36 CFR § 800.2 (c)(2)(ii)(A).  In this case, the White Earth Nation attaches historic, cultural and spiritual significance to the areas affected by Enbridge's projects.

Plaintiffs assert the State Department acknowledged that the Expansion Project is an undertaking and recognized its authority over the project by initiating the Section 106 consultation process.  Notice of Intent, 78 Fed. Reg.

16,565, 16,567 (Mar. 15, 2013).  Yet, it did not complete the consultation process

before authorizing the Bypass Project.  Plaintiffs assert the Bypass Project is also

an undertaking, which has the same effects as the Expansion Project.

Plaintiffs further assert the new pipeline is an undertaking because it is a

project under the direct or indirect jurisdiction of a Federal agency.  Here, at a

minimum, the State Department had an opportunity to exercise its authority over

the new pipeline.  Yet the State Department did not complete, or even initiate, the

Section 106 consultation process.

## C.    Agency Action

The State Department argues that Plaintiffs' claims that it violated NEPA

and the NHPA fail because the claims are not based on an agency action or a final

agency action - a required element of an APA claim.  Agency action is defined in

the APA to include "the whole or part of an agency rule, order, license, sanction,

relief, or the equivalent thereof, or failure to act."  5 U.S.C. § 551(13).  The agency

action complained of must be a "final agency action."  5 U.S.C. § 704.  Final

agency actions are those that "mark the consummation of the agency's

decisionmaking process" and "by which rights or obligations have been

determined, or from which legal consequences will flow."  Bennett v. Spear, 520

U.S. 154, 178 (1997).

Plaintiffs' claims are based on the two letters from the State Department to Enbridge regarding the Bypass Project and the Replacement Project.  The State Department argues that in making the determinations that the projects were either consistent with or outside the scope of the relevant Permit, it was acting pursuant to the President's directives set forth in Executive Order 13337. Therefore, the letters at issue are not an agency action that is reviewable under the APA.

It is well-settled that Presidential actions are not agency actions that are reviewable under the APA.  Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992); Dalton v. Specter, 511 U.S. 462, 476 (1994).  Noting that the President is not explicitly excluded from or included within the APA's purview, the Supreme Court held that "[o]ut of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."  Franklin, 505 U.S. at 800-01.  Even where the President delegates his inherent constitutional authority to an agency head, the action remains the action of the President and such action is not reviewable under the APA.  See Jensen v. Nat'l Marine Fisheries Serv., 512

F.2d 1189, 1191 (9th Cir. 1975) (finding that actions of Secretary of State in

approving regulations concerning fishing were not reviewable under APA

because President delegated his power to approve such regulations to Secretary);

Tulare Cnty v. Bush, 185 F. Supp.2d 18, 29 (D. D.C. 2001) (finding that plaintiffs

failed to allege agency action as Forest Service was merely carrying out directives

of the President) aff'd on other grounds, 306 F.3d 1138 (D.C. Cir. 2002); Alaska v.

Carter, 462 F. Supp. 1155, 1160 (D. Alaska 1978) (finding that Presidential actions

under the Antiquities Act are not subject to the impact statement requirements of

NEPA because NEPA applies only to "federal agencies" and the President is not

a federal agency"); Ancient Coin Collectors Guild v. U.S. Customs and Border

Protection, 801 F. Supp.2d 383, 401-05 (D. Md. 2011) (finding that because

President had delegated his responsibilities under the Convention on Cultural

Property Implementation Act to the State Department and Assistant Secretary,

actions taken on behalf of the President under this Act are not reviewable under

the APA) aff'd 698 F.3d 171 (4th Cir. 2012), cert. denied, 133 S. Ct. 1645 (2013).

In actions regarding different pipelines that crossed the international

borders of Canada and the United States, courts have held that the State

Department's issuance of a Presidential Permit pursuant to Executive Order

13337 was Presidential action and therefore not subject to review under the APA.

See Sisseton Wahpeton Oyate v. U.S. Dep't of State, 659 F. Supp.2d 1071, 1082

(D.S.D. 2009); Natural Res. Def. Council, Inc. v. U.S. Dep't of State, 658 F. Supp.2d

105, 113 (D. D.C. 2009).  The courts found that the delegation of the President's

constitutional authority concerning international borders to the Secretary of State

did not change the fundamentally Presidential nature of the action.  Sisseton, 659

F. Supp.2d at 1081; Natural Res. Def. Council, 658 F. Supp.2d at 112-13.  In so

finding, one court recognized that given the fact that the President has "complete,

unfettered discretion over the permitting process" and that no statute curtails the

President's authority to issue or deny a permit, exposing such permitting

decisions to judicial review would "run afoul of the separation of powers

concerns that underlie the Supreme Court's decisions in Franklin and Dalton."

Natural Res. Def. Council, 658 F. Supp.2d at 111.  See also, Detroit Int'l Bridge Co.

v. Government of Canada et al., Civ. No. 10-476, 2015 WL 5726601 *22 (D.D.C.

Sept. 30, 2015) (finding that the decision of the State Department to issue a

Presidential Permit pursuant to Executive Order 11423 regarding an international

bridge between Canada and Detroit, Michigan was a "Presidential" action that is

not subject to review under the APA).

Plaintiffs argue the State Department's decisions with respect to the Bypass and Replacement Projects are subject to judicial review.  In support, Plaintiffs cite to a decision from this District in which the court, in a footnote, disagreed with the decisions in <u>Sisseton-Wahpeton</u> and <u>Natural Res. Def. Council</u> "insofar as they hold that any action taken by the State Department pursuant to an executive order, and in particular the preparation of an EIS for a major federal action, is not subject to judicial review." <u>Sierra Club v. Clinton</u>, 689 F. Supp.2d 1147, 1157 n. 3 (D. Minn. 2010); <u>see</u> <u>also</u> <u>Protect Our Communities Foundation v. Chu, No.</u>, 12CV3062, 2014 WL 1289444 (S. D. Cal. Mar. 27, 2014) (rejecting Presidential action argument asserted by the Department of Energy).

The Court must reject Plaintiffs' argument.  First, the overwhelming authority supports a finding that the State Department's actions in this case are Presidential in nature, and thus not subject to judicial review.  Second, the court in <u>Sierra Club</u> did not decide the issue of whether the State Department's actions pursuant to the Presidential Permits at issue here are Presidential in nature, therefore that case is not persuasive on the issue.

Although this case differs from <u>Sisseton-Wahpeton</u> and <u>Natural Res. Def. Council</u> in that it involves the State Department's interpretation of a Presidential

Permit rather than a determination on an initial application for a Presidential

Permit, the Court finds both types of determinations are Presidential in nature

and should not be subject to judicial review.  Here, Enbridge reached out to the

State Department to obtain confirmation that the Replacement Project for the

border segment was consistent with the 1991 Permit covering Line 3 and that the

Bypass Project was outside the scope of the Line 67 Permit, as the

interconnections were outside the border segment.  In responding to such

inquiries, the State Department was carrying out the directives of the President as

set forth in Executive Order 13337, which included maintenance issues on

existing pipelines, and which defined the scope of the Permit "at the borders of

the United States."  See Exec. Order 13337 § 1(a) ("Secretary of State is designated

and empowered to receive all applications for Presidential permits [] for the

construction, connection, operation and maintenance, at the borders of the

United States, of facilities for the exportation or importation of petroleum,

petroleum products, coal, or other fuels to or from a foreign country.") (emphasis

added).


Accordingly, the Court finds that Plaintiffs' claims under the APA must

fail as they are not based on agency action.

**IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 69] is

        DENIED;

2.      Intervenor Enbridge Energy, Limited Partnership's Motion for

        Partial Summary Judgment [Doc. No. 88] is GRANTED;

3.      Defendants' Motion for Partial Summary Judgment [Doc. No. 92] is

        GRANTED;

4.      Counts One and Two are dismissed with prejudice;

5.      Defendants' Motion to Strike Pleading [Doc. No. 84] is DENIED as

        moot;

6.      Plaintiffs' Motion to File Reply as to Motion to Strike [Doc. No. 99] is

        DENIED as moot; and

7.      Defendants' Motion for Leave to Submit Supplemental Authority

[Doc. No. 110] is GRANTED.

Date:   December 9, 2015

s/ Michael J. Davis
Michael J. Davis
United States District Court